[Crim. No. 36553. Second Dist., Div. Four. Oct. 28, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JOURDAIN, Defendant and Appellant.

398

COUNSEL

Burton Marks and Jonathan K. Golden for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Sandy R. Kriegler, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MUNOZ, J.*—Following a jury trial appellant, Michael Jourdain, was found guilty in count I of furnishing heroin, a violation of Health and Safety Code section 11352, subdivision (a), and in count II with furnishing cocaine, also a violation of Health and Safety Code section 11352, subdivision (a). The appeal is from the judgment.

### FACTS

On September 20, 1978, Los Angeles Police Officer Pedrosa was introduced to Douglas Powell. Pedrosa, who was working undercover, indicated he wished to purchase six ounces each of cocaine and heroin. On September 21, Pedrosa contacted Powell who indicated he was un-

---

*Assigned by the Chairperson of the Judicial Council.

able to make contact with his connection. He asked Pedrosa to call back the next day.

On September 22, Pedrosa called at 9 a.m. and was informed Powell had to contact his connection, but Pedrosa should call back at 10 a.m. At 10 a.m. Pedrosa called once again and Powell indicated he had talked to his connection and the price would be $1,400 for each ounce of cocaine, and $1,050 for each ounce of heroin. The transaction was to take place in the subterranean garage of the Fox Hills Mall in Culver City so that it could go unnoticed by the police. Powell further indicated his connection would arrive in a light blue vehicle and he would be carrying a beeper to an answering service.

Later Pedrosa called Powell and indicated he did not like the location for the transaction because he did not know Powell or his connection well enough to go into an underground garage with them. At that point, it was agreed that Powell would instead meet Pedrosa at a gas station near the mall. About 12:30 Pedrosa met Powell who stated he had been unable to contact his connection. Over the next forty-five minutes, Powell attempted three or four phone calls to the connection. In explaining the fact that he could not reach the connection, Powell stated that the connection probably had his beeper turned off. He further indicated he had left a message with the answering service to have the connection call him back at the phone booth. While Powell was making the calls, another undercover officer had walked over near the telephone booth and tried to see what number Powell was calling. He determined that the last five digits were "96321."

Around 1:15 p.m. Powell received the phone call he had been expecting. He came back to the car and told Pedrosa he was going to meet his connection at the mall and then would return to Pedrosa's location.

Powell then drove to the mall and parked his car midway in the underground parking lot. Exiting his car, he entered the first floor of the mall and sat on a bench. He was not carrying or holding anything. After about five or ten minutes, appellant approached Powell and the two rode the escalators to the third floor of the mall. They disappeared for a short time, but were picked up again when they went into the parking structure and approached a blue 1978 Cadillac Seville. Appellant opened the trunk of the Cadillac, picked out a paper sack which was rolled in a cylindrical fashion, and handed it to Powell. Then the

two walked back towards the mall. Shortly thereafter the two were observed entering the mall again with Powell carrying the paper sack.

Powell went back to his car and drove back to the service station where he parked his car and walked to Pedrosa's car, stating, "I've got the stuff." Powell removed two plastic bags from his waist band and handed them to Pedrosa. One of the bags contained cocaine and the other contained heroin.

Powell asked to see the money, but Pedrosa stated he would not show Powell any money until he had seen all of the merchandise. The two walked to Powell's car where Powell gave Pedrosa a brown paper bag which contained ten additional bags: five contained cocaine and five contained heroin. The total street value of all 12 bags was $85,000: $60,000 for the cocaine and $25,000 for the heroin. After receiving a verbal signal from Pedrosa, who had been wired with a transmitter during the transaction, other officers descended upon Powell and Pedrosa. They arrested Powell and pretended to arrest Pedrosa. A search of Powell's person produced a small black telephone book with several cards inside. On the back of one of the cards was the number 849-6321 and the initials MRJ beside it. Also on the card was 66385 and the word "page" written in.

In the meantime, appellant had also been arrested. On appellant's person another telephone book was found as well as a pager. One of the numbers on the pager was 66385. An officer then dialed 849-6321 and asked the answering service to page 66385. The pager started beeping within 10 seconds. In the phone book taken from appellant, the police found Powell's phone number. It was the same one used by the police to contact Powell.

After the arrests but before trial, Powell died and only appellant went to trial.

### Errors in Instructing on Conspiracy

■ Appellant initially contends he was denied due process of law because the jury instructions permitted him to be connected to the illegal conspiracy and hence convicted upon a lower standard than beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed. 2d 368, 375, 90 S.Ct. 1068].) At trial appellant was not charged with conspiracy but it was one of the theories used to connect Powell to ap-

pellant. Appellant objected to the standard jury instructions on conspiracy and instead requested the court to instruct the jury that he could not be found guilty under a conspiracy theory unless the jury specifically found beyond a reasonable doubt that he was a member of the conspiracy.[1] Because conspiracy had not been charged as a separate offense, the court refused and among other instructions gave CALJIC No. 6.24 which provides as follows: "Any evidence of a statement made by one alleged conspirator other than at this trial shall not be considered by you as against another alleged conspirator unless you shall first determine from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed and unless you shall further determine that the statement was made while the person making the statement was participating in the conspiracy and before or during the time the person against whom it was offered was participating in the conspiracy and, finally, that such statement was made in furtherance of the objective of the conspiracy.

"The word 'statement' as used in this instruction includes any oral or written verbal expression or the nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression."

The crux of appellant's argument seems to be that under CALJIC No. 6.24 the jury could find him guilty of conspiracy upon something less than reasonable doubt. That argument misses the point. The People had not charged appellant with, nor were they trying to convict him of, conspiracy. The conspiracy theory was merely "a vehicle for using otherwise inadmissible hearsay evidence against" appellant by the use of the coconspirator exception to the hearsay rule. (*People* v. *Leach* (1975) 15 Cal.3d 419, 435 [124 Cal.Rptr. 752, 541 P.2d 296]; *People* v. *Durham* (1969) 70 Cal.2d 171, 180, fn. 7 [74 Cal.Rptr. 262, 449 P.2d 198]; *People* v. *Morales* (1968) 263 Cal.App.2d 368, 373 [69 Cal.Rptr. 402]; Evid. Code, § 1223.)

---

[1]The problem with this type of instruction is that it renders superfluous statements of coconspirators. As the court in *United States* v. *James* (5th Cir. 1978) 576 F.2d 1121, 1127-1128, stated: "Apparently it is not uncommon for the jury to be instructed that it must find the existence of the conspiracy and the defendant's connection to it beyond a reasonable doubt before ever considering the coconspirator hearsay. Obviously, this renders the hearsay totally superfluous, for, if we assume that the jury complied with the instructions, the hearsay evidence was not available to the jury until it had already found the defendant guilty beyond a reasonable doubt. This flows from the fact that the preliminary facts necessary for admissibility coincide with the ultimate facts necessary for conviction; i.e. the existence of the conspiracy and the membership of the accused in it." (Fn. omitted.)

The admission of this evidence was not affected by the fact the information had not charged a conspiracy (*People* v. *Morales, supra,* 263 Cal.App.2d 368), and once there had been proof of the existence of the conspiracy there was no error in instructing the jury on the law of conspiracy. (*People* v. *Remiro* (1979) 89 Cal.App.3d 809, 842 [153 Cal. Rptr. 89]; *People* v. *Washington* (1969) 71 Cal.2d 1170, 1174 [81 Cal. Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541].) In so charging the jury the court was not in any way indicating that appellant was being tried for the crime of conspiracy. Rather, the court was merely instructing the jury on the law applicable to the case. (Pen. Code, § 1093.) CALJIC No. 6.24 indicated to the jury how and when it could use the incriminating statements of Powell which were allegedly made during the existence of the conspiracy.

The instruction did not tell the jury it could find appellant guilty upon less than reasonable doubt. There was only one instruction on the burden of proof given to the jury. That instruction told the jury in terms of Penal Code section 1096 that it could not find appellant guilty until his guilt had been proved beyond a reasonable doubt. (CALJIC No. 2.90.) Notwithstanding appellant's protestations to the contrary, CALJIC No. 6.24 did not allow appellant to be convicted upon a showing of less than a reasonable doubt.

As an ancillary argument, appellant also asks this court to fashion a new standard for the admission of coconspirators' statements under Evidence Code section 1223. We decline the invitation. The Legislature has already acted in this area by enacting Evidence Code section 403. ▮ The comment to this section by the Legislative Committee indicates that evidence under section 1223 is admissible when "evidence sufficient to sustain a finding of the conspiracy" had been introduced. That sufficiency has been defined by case law as requiring only prima facie evidence. There is no requirement that the People show the existence of "a conspiracy beyond a reasonable doubt or even by a preponderance of the evidence." (*People* v. *Earnest* (1975) 53 Cal.App. 3d 734 [126 Cal.Rptr. 107]; *People* v. *Lipinski* (1976) 65 Cal.App.3d 566 [135 Cal.Rptr. 451]; *People* v. *Steccone* (1950) 36 Cal.2d 234 [223 P.2d 17].)

THE ADMISSION INTO EVIDENCE OF POWELL'S STATEMENTS

▮ Appellant next contends the court erred in allowing Powell's statements to be admitted under the coconspirator exception to the

hearsay rule. Specifically, he objects to Powell's statements that the "connection" would arrive in a light blue car, and would use a "beeper."

Under Evidence Code section 1223[2] three preliminary facts must be established before the declaration of a coconspirator is admissible: (1) the declaration must have been made while the declarant was involved in the conspiracy; (2) the declaration must have been in furtherance of the conspiracy; and (3) the party against whom the declaration is offered must have been in the conspiracy or would later participate in the conspiracy. (*People* v. *Leach, supra*, 15 Cal.3d 419, 430, fn. 10.)

Although the existence of the conspiracy must be shown by independent proof. (*People* v. *Leach, supra*), the showing need only be prima facie evidence of the conspiracy. (*People* v. *Steccone, supra*, 36 Cal.2d at p. 238.) The prima facie showing may be circumstantial (*People* v. *Lipinski, supra*, 65 Cal.App.3d at p. 575), and may be by means of any competent evidence which tends to show that a conspiracy existed. (*People* v. *Calhoun* (1958) 50 Cal.2d 137, 144 [323 P.2d 427].)

Here there is no question that the evidence showed that Powell was involved in a conspiracy with someone. On September 21, 1978, Powell could not deliver the controlled substance to Officer Pedrosa and told Officer Pedrosa to call back the next day. The next day when Officer Pedrosa called at 9 a.m., he was told to call back at 10 a.m. When Officer Pedrosa called back at 10 a.m., he was told that Powell had made contact with his connection and that the price was to be $1,050 for each ounce of heroin and $1,400 for each ounce of cocaine. Powell further indicated that the transaction was to take place in a subterranean garage in the Fox Hills Mall. These statements by Powell were declarations of the agreement itself, were not hearsay and were admissible to prove the prima facie existence of the agreement. (*People* v. *Curtis* (1951) 106 Cal.App.2d 321, 326 [235 P.2d 51]; Witkin, Cal. Evidence (2d ed. 1966) §§ 465, 521, pp. 426, 492.) Moreover, Powell's actions and conduct in later making numerous calls from a phone booth

---

[2]Evidence Code section 1223 reads as follows: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:

"(a)  The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy;

"(b)  The statement was made prior to or during the time that the party was participating in that conspiracy; and

"(c)  The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

before finally receiving one back and proceeding to the Fox Hills Mall was further circumstantial evidence that Powell was working with someone else in the transaction. (*People* v. *Morales, supra,* 263 Cal. App.2d 368, 373.) The evidence was sufficient to meet the three requirements of Evidence Code section 1223. There was no error in the admission of Powell's statements which implicated appellant.

## THE SECTION 995 MOTION

■ Appellant's third assignment of error is that his motion to dismiss pursuant to Penal Code section 995 was erroneously denied. Even though appellant was convicted, this contention is reviewable on appeal. (*People* v. *Elliot* (1960) 54 Cal.2d 498, 504-505 [6 Cal.Rptr. 753, 354 P.2d 225].)

At the preliminary hearing the People did not call the officer who actually made the physical arrest of appellant. Instead they called Officer Lutz who was in overall charge of the controlled buy and who was in radio contact with his office. In turn the office was in phone contact with Sergeant Del Rosario. After the arrest of Powell had occurred, Officer Lutz told his office to tell Sergeant Del Rosario to arrest appellant. A secretary at the office then conveyed Officer Lutz's command to Sergeant Del Rosario.

Appellant argues that since neither Sergeant Del Rosario nor the secretary testified as to the reasons for the arrest, the resulting arrest was unlawful. (*People* v. *Madden* (1970) 2 Cal.3d 1017 [88 Cal.Rptr. 171, 471 P.2d 971]; *People* v. *Harvey* (1958) 156 Cal.App.2d 516 [319 P.2d 689].) Officer Lutz testified he had overheard the transaction taking place and had seen the bag which Powell had tried to sell to Officer Pedrosa. Officer Murphy had previously seen appellant hand a similar bag to Powell in the parking lot of the mall. Officers Lutz and Murphy were in radio contact with one another and both were present when Powell was arrested. Although Officer Lutz issued the order to have appellant arrested, both officers testified they had made the decision to have appellant arrested. It was Officers Lutz and Murphy who ordered the arrest of appellant, not the secretary and not Sergeant Del Rosario. Since both officers were present at the preliminary hearing and available for questioning, the purpose of the *Harvey-Madden* rule was satisfied. (See *Sanderson* v. *Superior Court* (1980) 105 Cal.App.3d 264, 269-270 [164 Cal.Rptr. 290].)

■ Relying upon cases such as *People* v. *Blackshear* (1968) 261 Cal.App.2d 65 [67 Cal.Rptr. 662], and *People* v. *Lawrence* (1959) 168 Cal.App.2d 510 [336 P.2d 189], appellant further argues that the evidence at the preliminary hearing was insufficient to hold him to answer in superior court. Unlike the situations in *Blackshear* and *Lawrence*, here there was evidence that appellant had passed the bag with the controlled substances to Powell. That evidence was apparently believed by the magistrate since appellant was held to answer. The magistrate having made the factual determination, we may not at this time substitute our judgment for his. (*People* v. *Murray* (1971) 21 Cal.App.3d 864 [99 Cal.Rptr. 55].) The motion to dismiss was properly denied.

## INSUFFICIENCY OF THE EVIDENCE

■ By means of a supplemental brief, appellant contends the evidence was insufficient to establish that he knew of the narcotic nature of the substance which Powell passed to Officer Pedrosa. (See *People* v. *Williams* (1971) 5 Cal.3d 211 [95 Cal.Rptr. 530, 485 P.2d 1146].) The contention is primarily based upon a supposition that Powell's statements were erroneously admitted. As has been discussed, *ante*, the statements were properly admitted and the jury must have found that appellant was Powell's "connection" and he was selling cocaine for $1,400 an ounce and heroin for $1,050 an ounce. Moreover, the secrecy taken in the transaction and the use of the beeper and numerous phone calls clearly indicates that appellant knew of the nature of the substance. The evidence was credible and of solid value and of the type such that a rational trier of fact could have found appellant guilty beyond a reasonable doubt. (*People* v. *Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468].) The contention is without merit.

## THE SENTENCING

■ At sentencing, appellant complained because the probation report referred to a prior juvenile arrest for which the disposition was unknown and to a pistol which was found in appellant's glove compartment at the time he was arrested. The probation officer had talked to appellant about the juvenile arrest and appellant confirmed that he had been placed on probation and also gave the circumstances of the incident. Even though the court struck the juvenile references from the report, it was not required to do so. (*People* v. *Phillips* (1977) 76 Cal. App.3d 207 [142 Cal.Rptr. 658].) The court's actions in striking the

references could only rebound to appellant's benefit and may not be used to predicate error.

Appellant further argues that the gun had been ordered suppressed at the pretrial motion to suppress. In this he is mistaken. What the court did was rule that the gun was irrelevant and therefore inadmissible. Thus, the probation officer did not violate the rule of *People* v. *Belleci* (1979) 24 Cal.3d 879 [157 Cal.Rptr. 503, 98 P.2d 473], by making reference to the gun. Appellant is not entitled to be resentenced.

The judgment is affirmed.

Files, P. J., and Woods, J., concurred.

A petition for a rehearing was denied November 17, 1980, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied December 30, 1980. Bird, C. J., was of the opinion that the petition should be granted.